UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RIVERVIEW EAST WINDSOR, LLC,     :

    Plaintiff,               :

V.                               :        No. 3:10-CV-872(RNC)

CWCAPITAL LLC, et al.,           :

    Defendants.              :

- - - - - - - - - - - - - - -x

GROTON ESTATES, LLC, et al.,     :

    Plaintiff,               :

V.                               :        No. 3:10-CV-873(RNC)

CWCAPITAL LLC, et al.,           :

    Defendants.              :

<u>RULING AND ORDER</u>

These two consolidated cases are here on removal.  The
actions arise from commercial real estate loans secured by
mortgages that are being foreclosed in state court.  The
plaintiffs, Riverview East Windsor, LLC ("Riverview") and Groton
Estates, LLC ("Groton"), are the borrowers on the loans.  They
claim that the special servicer of the loans, CWCapital Asset
Management LLC ("CWCAM"), and two affiliates, CWCapital LLC and
CWCapital Investments LLC, caused the lenders to move to
foreclose and did so for an improper motive in violation of state

1

law.[1]  The defendants have moved to dismiss the complaints
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure
for failure to state a claim on which relief can be granted.
They contend that the claims are barred by decisions of the state
courts in the foreclosure proceedings and, in addition, that the
allegations in the complaints are legally insufficient to state a
plausible claim to relief under state law.  The plaintiffs
respond that they should be permitted to obtain discovery and
have their day in court on the merits of their claims.  For
reasons that follow, the motions to dismiss will be granted.

I.  Background

     The complaints allege the following.  Riverview and Groton
are Connecticut single-asset limited liability companies
substantially owned by Michael Belfonti or the "Belfonti family."
In 2004, Riverview and Groton purchased properties in East

---

     [1] The allegations in the complaints mirror allegations
interposed by the borrowers in the underlying foreclosure
proceedings both by way of special defenses and counterclaims
against the lenders, and also by way of unsuccessful motions to
permit the borrowers to pursue third-party complaints against
CWCAM and the other two defendants named in these actions.  After
the state courts declined to permit the borrowers to litigate the
third-party complaints in the foreclosure proceedings, the
borrowers filed the complaints in these actions, which were then
removed.  Since these cases were removed, the special defenses
and counterclaims against the lenders in the foreclosure
proceedings have been rejected as a matter of law and judgments
of strict foreclosure have been entered.  See Wells Fargo Bank,
N.A. v. Riverview East Windsor, LLC, No. CV-09-6004927-S (Conn.
Super. Ct. Oct. 24, 2011)(judgment of strict foreclosure
entered); Bank of America, N.A. v. Groton Estates, LLC, No. CV-
09-6001697 (Conn. Super. Ct. Oct. 24, 2011)(same).

Windsor, and Groton, Connecticut, respectively.  Riverview
financed its purchase with a mortgage loan made by Deutsche Bank,
which was ultimately reassigned to Wells Fargo Bank, N.A.  Groton
financed its purchase with a mortgage loan made by Archon
Financial, L.P., which is now held by Bank of America, N.A.

On May 27, 2009, Michael Belfonti sent letters to the master
servicers of the loans (in the case of Riverview, an entity named
Capmark; in the case of Groton, an entity named Midland Loan)
informing them that the borrowers (i.e., Riverview and Groton)
would no longer be able to service the loans in full while also
properly maintaining the properties.  At the time the letters
were sent, both borrowers were in full compliance with the terms
of the loans and had met their obligations since the commencement
of the loans.  Mr. Belfonti's letter stated that the borrowers'
inability to meet their obligations was caused "in significant
part by the historically difficult economic times."  In response,
the lenders and their agents refused to have any discussions
about the issues raised in the May 27 letters until the borrowers
signed an onerous "pre-negotiation agreement," which required
them to acknowledge that they had no claims or defenses against
the lenders.  The parties subsequently spent considerable time
negotiating the terms of a pre-negotiation agreement.

In July 2009, while the parties were still negotiating,
Mr. Belfonti met with Jim DeAngelo, Vice President/Senior Asset

Manager for CWCAM.  The loans had been transferred to CWCAM for special servicing in mid-June after the borrowers defaulted on their mortgage payments.  With regard to each loan, Mr. DeAngelo informed Mr. Belfonti that, while they would have to proceed with foreclosure, he expected a workout could be attained and looked forward to reviewing Mr. Belfonti's proposal.  Mr. Belfonti asked Mr. DeAngelo whether he knew anything about difficulties he, Mr. Belfonti, was having with CWCAM regarding another Belfonti family property known as the Phoenix Apartments in Indianapolis.  Mr. DeAngelo stated that he was unaware of CWCAM's involvement with the Phoenix property.  Later in July 2009, a notice of default was issued to both Riverview and Groton by counsel for the lenders.  On receipt of these notices, Mr. Belfonti tried to contact Mr. DeAngelo to discuss potential workouts, including how to allocate funds among necessary repairs and outstanding debt service.  His calls went unreturned.

On September 15, 2009, a revised pre-negotiation agreement was provided to Mr. Belfonti based on discussions between the parties.  On September 22, 2009, the lenders commenced foreclosure proceedings.  On October 6, 2009, Mr. Belfonti executed a revised pre-negotiation agreement on behalf of both Riverview and Groton.  Approximately one week later, he submitted a workout proposal to Mr. DeAngelo with regard to each property. In a subsequent telephone conversation between Mr. Belfonti and

Mr. DeAngelo, Mr. DeAngelo began the conversation by asking Mr. Belfonti, "Are you the Michael Belfonti that was the sponsor on the Westin Aruba transaction?"  When Mr. Belfonti replied in the affirmative, Mr. DeAngelo stated, "I was hoping it was another Michael Belfonti."

In late November or early December 2009, Mr. Belfonti attempted to discuss his workout proposals with Mr. DeAngelo. Instead of discussing the proposals, Mr. DeAngelo stated that the foreclosure proceedings would continue and there would be efforts to remove the property manager (a Belfonti-related entity) and place each property into receivership.  Mr. Belfonti asked whether the removal was because of a problem with his management of the assets.  Mr. DeAngelo answered "No, that's our policy." Mr. Belfonti asked how he should handle funds for the properties. Mr. DeAngelo told him to hold all funds until there was some resolution or further instruction and that he would "be in touch."  Thereafter, repeated attempts by Mr. Belfonti to contact CWCAM were met with silence and unreturned phone calls and emails.

The complaints attribute CWCAM's failure to discuss Mr. Belfonti's workout proposals to his involvement in litigation arising from a failed investment in Aruba.  With regard to the Aruba matter, the complaint alleges the following.  In 2006, Mr. Belfonti and others, through a series of entities, closed on the

purchase of Aruba Hotel Enterprises ("AHE"), an Aruban limited liability company.  At the time of the closing, AHE owned what is now known as The Westin Resort, Aruba.  In order to finance the purchase, Mr. Belfonti arranged two loans for AHE - a mortgage loan by Wachovia and a mezzanine loan by Petra Mortgage Capital Corp, LLC.[2]  In April 2007, AHE defaulted on both loans.  Petra subsequently foreclosed on its interest, becoming the beneficial owner of AHE, then Wachovia foreclosed on the shares of AHE. Following these foreclosures, litigation ensued between AHE and Belfonti Holdings, LLC and other related entities of Mr. Belfonti.  Plaintiffs allege on information and belief that "one or more of the defendants was in the capital stack of the Aruba property in that it assumed some of the capital invested for AHE's financing of the Aruba property."

Plaintiffs also allege that CWCAM caused difficulty for Mr. Belfonti in connection with the Phoenix Apartments in Indianapolis mentioned earlier.  The Belfonti family owns the Phoenix Apartments through another single-asset entity called RCM Phoenix Partners, LLC ("RCM").  In 2004, RCM financed the purchase of this property with a mortgage loan made by Goldman

---

[2] Court records show that Mr. Belfonti had a 75% ownership interest in AHE and arranged for both loans.  Wachovia's mortgage loan was in the amount of $230,000,000; Petra's mezzanine loan was in the amount of $19,450,000.  See Aruba Hotel Enterprises, N.V. v. Belfonti, No. 07 Civ. 07564(PAC), 2011 WL 5865257, at *2 (S.D.N.Y. Nov. 21, 2011); Aruba Hotel Enterprises N.V. v. Belfonti, 611 F. Supp. 2d 203, 206 (D. Conn. 2009).

Sachs.  In July 2007, RCM executed an agreement to sell the
property.  To effectuate the sale, RCM needed the approval of
CWCAM and Wachovia for the new buyer to assume the outstanding
loan.  In a letter dated March 5, 2009, CWCAM informed Wachovia
that it would consent to RCM's request on three conditions.  By
letter to Wachovia and CWCAM dated March 31, 2009, Mr. Belfonti
questioned the rationale of the three conditions.  He never
received a reply.  The plaintiffs allege that CWCAM imposed these
conditions in retaliation for Mr. Belfonti's involvement in the
Aruba dispute and in an attempt to ensure that the Phoenix
transaction could not close.  They further allege that by
"stonewalling" the closing, CWCAM sought to "financially cripple"
Mr. Belfonti so he could not continue funding the Aruba
litigation or meet obligations regarding other real estate deals,
including the Riverview and Groton loans.

Each of the complaints contains the following counts under
state law: (1) tortious interference with business relations
against CWCAM only, (2) breach of the implied covenant of good
faith and fair dealing against CWCAM only, (3) breach of
fiduciary duty against CWCAM only, (4) civil conspiracy against
all three defendants, and (5) violation of the Connecticut Unfair
Trade Practices Act ("CUTPA"), Conn. Gen. Stat., §42-110a *et
seq.*, against all three defendants.  In response to the motions
to dismiss, plaintiffs have stated that they do not oppose

dismissal of the counts claiming breach of fiduciary duty.

The complaints allege that CWCAM acted wrongfully by (1) refusing to timely respond to Mr. Belfonti's letter of May 27, 2009, with instructions as to how to allocate funds between debt service and repairs; (2) instructing Mr. Belfonti in late November or early December 2009 to hold funds until there was a resolution or further instructions, which were never given; (3) failing to adequately consider or advise the lenders regarding Mr. Belfonti's workout proposals; and (4) imposing onerous and extraneous conditions with respect to the Phoenix property to ensure that the Phoenix transaction would not close and Mr. Belfonti could not continue meeting his obligations with regard to the Riverview and Groton loans.

With regard to damages, the complaints allege that the borrowers have been forced to manage the properties under difficult circumstances; been forced to defend difficult and costly foreclosure proceedings based on defaults caused by CWCAM; suffered diminished value of the properties due to commencement of needless foreclosure proceedings; and suffered reputational damages, which affect the way banks treat Mr. Belfonti and his companies with regard to other real estate deals.

II.  Discussion

Rule 12(b)(6) allows dismissal of claims when the allegations of the complaint fail to state a claim on which

relief can be granted.  In deciding a motion to dismiss under this rule, a court accepts the allegations of the complaint as true, construes them in a manner favorable to the plaintiff and draws reasonable inferences in the plaintiff's favor.  <u>Yung v. Lee</u>, 432 F.3d 142, 146 (2d Cir. 2005).  Defendants contend that the plaintiffs' claims are precluded by collateral estoppel and that the allegations in the complaints are insufficient to state a plausible claim to relief under state law.  I do not think the claims are barred but do agree the allegations are legally insufficient.

A.  <u>The Claims Are Not Barred By Collateral Estoppel</u>

Defendants contend that the plaintiffs' claims against the defendants are precluded by decisions of the state courts rejecting special defenses and counterclaims premised on CWCAM's alleged failure, as special servicer of the defaulted loans, to negotiate a workout of the loans in good faith.  <u>See</u> <u>Bank of America, N.A. v. Groton Estates, LLC</u>, No. CV096001697, 2010 WL 3259815 (Conn. Super. Ct. July 13, 2010); <u>Wells Fargo Bank, N.A. v. Riverview East Windsor, LLC</u>, No. CV096004927, 2010 WL 3584365 (Conn. Super. Ct. Aug. 11, 2010); <u>Wells Fargo Bank, N.A. v. Riverview East Windsor, LLC</u>, No. CV096004927, 2010 WL 5610864 (Conn. Super. Ct. Dec. 22, 2010).  In these decisions, the state courts held that the borrowers' allegations regarding CWCAM's failure to respond to Mr. Belfonti's inquiries and workout

proposals were legally insufficient to support any tort claims
against CWCAM for which the lenders could be vicariously liable.
In so holding, the courts adhered to Connecticut precedent
establishing that a lender is entitled to proceed with a
foreclosure in accordance with the express terms of the loan
documents and has no obligation to negotiate a workout.  <u>See</u>
<u>Southbridge Assocs., LLC v. Garofalo</u>, 53 Conn. App. 11, 16-17
(1999); <u>Great Country Bank v. Kiely</u>, No. CV94-04-74-60S, 1995 WL
625917, *4 (Conn. Super. Ct. Jan. 19, 1995).

To determine whether collateral estoppel applies, this court
looks to the preclusive effect of the decisions under Connecticut
law.  <u>See</u> <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S.
75, 82-83 (1984).  Connecticut allows for nonmutual collateral
estoppel in accordance with § 29 of the Restatement (Second) of
Judgments, which lists factors to consider when deciding whether
a party should be allowed to relitigate an issue against a new
party.  ("What combination of circumstances justifies withholding
preclusion is a matter of sound discretion, guided by the general
principle that a party should not be precluded unless his
previous opportunity was at least the equivalent of that
otherwise awaiting him in the present litigation."  Restatement
(Second) of Judgments § 29, cmt. b. (1982).)  Among the factors
to consider is whether "[t]he person seeking to invoke favorable
preclusion, or to avoid unfavorable preclusion, could have

10

effected joinder in the first action between himself and his present adversary."  Comment e to § 29 says, "where a plaintiff brings a subsequent action involving the same issues against a person whom he could appropriately have joined as a co-defendant in the first action, only strongly compelling circumstances justify withholding preclusion."

Here, the borrowers unsuccessfully moved to join CWCAM and its affiliates in the foreclosure proceedings in order to litigate the claims at issue.  The lenders opposed the motions on the ground that there was little or no nexus between the issues raised by their foreclosure complaints and the borrowers' proposed third-party complaints against CWCAM and its affiliates. The motions were denied by summary orders (i.e., without a statement of reasons).  Thus, we have a situation in which the parties seeking to avoid unfavorable preclusion (the borrowers) were not permitted to effect joinder in the first action.  In these circumstances, I do not think collateral estoppel should apply to prevent the borrowers from litigating directly against CWCAM and its affiliates.

B.   The Allegations Are Insufficient To State A Plausible Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)(quoting Bell Atlantic

11

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A complaint is
plausible when sufficient facts are pleaded to permit a
reasonable inference that the defendant is liable for the
misconduct alleged.  Iqbal, 129 S. Ct. at 1949.  In applying the
plausibility standard, a court is guided by two principles:
first, although the factual allegations in a complaint must be
accepted as true, "threadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice"; and second, "[d]etermining whether a complaint states a
plausible claim for relief [is] a context-specific task that
requires the reviewing court to draw on its judicial experience
and common sense."  Iqbal, 129 S. Ct. at 1949-50.  I conclude
that neither CWCAM's alleged actions as special servicer of the
loans at issue nor its alleged actions with regard to RCM and the
Phoenix property are sufficient to state a plausible claim to
relief by the present plaintiffs under any of the legal theories
asserted in the consolidated complaints.

    1.  <u>Claims Related to CWCAM's Actions as Special Servicer</u>

    a.  <u>Tortious Interference</u>

Under Connecticut law, tort liability may be imposed on a
defendant who intentionally and improperly interferes with the
plaintiff's business relationship with another if the
interference causes the plaintiff to lose a benefit of the
relationship.  See <u>Solomon v. Aberman</u>, 196 Conn. 359, 364 (1985);

Holler v. Buckley Broadcasting Corp., 47 Conn. App. 764, 768
(1998).  The tortious interference claim against CWCAM in its
capacity as special servicer of the loans at issue, as clarified
by plaintiffs' memorandum in opposition to the motions to
dismiss, alleges interference with the relationship the
plaintiffs had with the lenders based on the mortgage loans.
Plaintiffs claim that CWCAM, in its capacity as special servicer
of the loans, interfered with these relationships by means of the
allegedly wrongful acts and omissions listed in the complaint.
These acts and omissions caused the plaintiffs to lose a benefit
of the relationship each plaintiff had with its lender,
plaintiffs claim, because the acts and omissions caused the
lenders to move for foreclosure.  Plaintiffs claim that the acts
and omissions were improper because they were motivated by a
desire to harm Mr. Belfonti due to his involvement in the Aruba
litigation.  For reasons stated below, I conclude that this claim
is legally insufficient.

Addressing each of CWCAM's allegedly wrongful acts and
omissions in turn, its failure to respond in a timely manner to
Mr. Belfonti's letters of May 27, 2009, requesting guidance
regarding allocation of funds, does not support a claim for
tortious interference.  The complaints allege that the letters
were sent to the master servicers of the loans some weeks before
the loans were transferred to CWCAM for special servicing.  The

complaints further allege that the lenders responded to the
letters by refusing to have any discussions with Mr. Belfonti
until an onerous "pre-negotiation agreement" was signed.
According to the complaints, the parties spent considerable time
negotiating the terms of a pre-negotiation agreement leading to
Mr. Belfonti's execution of a revised agreement more than four
months later, after foreclosure proceedings had commenced.
Because the lenders themselves allegedly refused to have
discussions with Mr. Belfonti regarding the issues raised in his
letters of May 27 until the pre-negotiation agreement was signed,
CWCAM was in no position to have such discussions with him in the
interim.  And because the lenders' precondition to discussions
regarding the issues raised in the letters of May 27 - a signed
pre-negotiation agreement - was not satisfied until after the
foreclosures commenced, CWCAM's alleged failure to respond to the
letters could not have caused the commencement of the
foreclosures.

The next tortious interference alleged in the complaints -
Mr. DeAngelo's telling Mr. Belfonti in a conversation in late
November or early December 2009 to hold funds pending a
resolution or further instructions then not giving any -
similarly fails to support a claim on which relief can be
granted.  By the time this conversation took place, the lenders
had commenced foreclosure proceedings.  There is no allegation

14

the foreclosures would have proceeded differently had not Mr. DeAngelo told Mr. Belfonti to hold funds.  Indeed, the complaints allege that Mr. DeAngelo told Mr. Belfonti to hold funds after informing him the foreclosure proceedings would continue and the property manager would be replaced at each location in accordance with CWCAM's "policy."  There is no allegation CWCAM did not actually have such a policy.  Court records show that a motion for appointment of a permanent receiver was filed in each foreclosure proceeding on January 10, 2010, not long after Mr. DeAngelo's conversation with Mr. Belfonti.  The records also show that the plaintiffs responded by moving to implead CWCAM on February 3, 2010, in order to litigate the claims now at issue.

CWCAM's alleged failure to adequately consider or advise the lenders regarding Mr. Belfonti's workout proposals also fails to support a tortious interference claim.  As just discussed, the complaints allege that the lenders refused to have discussions with Mr. Belfonti until an onerous pre-negotiation agreement was signed and none was signed by Mr. Belfonti until after foreclosure proceedings commenced.  It was only at that point, in mid-October 2009, that Mr. Belfonti provided Mr. DeAngelo with a workout proposal.  Under Connecticut law, the lenders were entitled to proceed with the foreclosures and had no obligation to negotiate with Mr. Belfonti concerning his proposals. Plaintiffs assert that they were treated differently than other

borrowers because CWCAM had a vendetta against Mr. Belfonti.  But no facts are alleged showing that similarly situated borrowers' workout proposals were treated better.  Moreover, the complaints do not allege that the loans would have been worked out if CWCAM had adequately considered or advised the lenders regarding the proposals.  Accordingly, the claim for tortious interference is properly dismissed for failure to state a claim on which relief can be granted.

      b.  <u>Good Faith and Fair Dealing</u>

The facts alleged in the complaints do not support a claim for breach of the implied covenant of good faith and fair dealing by CWCAM in its capacity as special servicer of the loans at issue.  The implied covenant is a rule of contract construction that aims to fulfill the reasonable expectations of the contracting parties as they presumably intended.  <u>See</u> <u>Magnan v. Anaconda Industries, Inc.</u>, 193 Conn. 558, 567 (1984).[3]  As the courts in the underlying foreclosure proceedings recognized, the implied covenant did not create a duty to negotiate a workout in the circumstances presented here.  In the absence of such an

_____

[3] <u>See</u> <u>also</u> <u>Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting</u>, 908 F.2d 1351, 1357 (7th Cir. 1990)("'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.  When the contract is silent, principles of good faith . . . fill the gap.  They do not block use of terms that actually appear in the contract.")

implied obligation, CWCAM's failure to respond to Mr. Belfonti's inquiries and workout proposals does not support a cause of action.

Connecticut law on this point reflects the majority rule. See Michael T. Madison, Jeffrey R. Dwyer & Steven W. Bender, 2 Law of Real Estate Financing § 14:5 ("Borrowers have had little success in challenging the lender's initiation of foreclosure remedies on the ground that the lender had a good faith duty to negotiate or to conclude a workout agreement. The cases agree that in the absence of an express contractual or statutory obligation, the mortgagee has no duty under the good faith doctrine to negotiate a workout agreement with the mortgagor."). The majority rule recognizes the primacy of express terms of a contract as evidence of the parties' intent and the need for predictability in contract law.

Plaintiffs argue by analogy to employment cases that just as an at will employee may have a cause of action against his employer for wrongful termination in violation of public policy, they should be able to sue CWCAM. Crediting the allegations of the complaints, however, there was no violation of public policy in this case. As special servicer of the defaulted loans, CWCAM's responsibility was to maximize recovery for the lenders. On the facts alleged, there is no reason to believe CWCAM breached this responsibility. Nor is there any reason to believe

17

CWCAM breached a legal obligation owed to the plaintiffs.  None
of the acts or omissions listed in the complaints was wrongful in
itself.

Plaintiffs assert that CWCAM acted with an improper motive
to "financially cripple" Mr. Belfonti.  But they do not allege
facts to flesh out the basis for the improper motive they ascribe
to CWCAM, which is necessary to make the claim plausible.  They
allege on information and belief that one or more of the
defendants invested money in the Aruba deal.  Accepting this
allegation as true, it is too slim a reed to support a plausible
claim that CWCAM was motivated to harm Mr. Belfonti.  Apart from
this, what do plaintiffs allege?  They allege that CWCAM
retaliated against Mr. Belfonti because of the Aruba litigation.
But there is no allegation that any of the three defendants was a
party to the litigation or had any interest in the litigation nor
any allegation concerning what Mr. Belfonti did regarding the
litigation that caused the defendants to want to harm him.  In
the absence of such allegations, it is implausible that CWCAM
retaliated against Mr. Befonti because of the litigation.

Plaintiffs point to Mr. DeAngelo's statement to Mr. Belfonti
after the foreclosures commenced that he was hoping Mr. Belfonti
was not the person involved in the Aruba deal.  Crediting the
allegation that this statement was made by Mr. DeAngelo, it does
not show a violation of public policy.  In seeking to fulfill its

18

responsibility to maximize recovery for the lenders on the loans at issue, CWCAM could legitimately consider what happened with regard to the loans Mr. Belfonti arranged in Aruba.

    c.  <u>CUTPA</u>

    In evaluating claims under CUTPA, courts look to whether the challenged practice is "immoral, unethical, oppressive, or unscrupulous."  <u>Provident Fin. Serv., Inc. v. Berkman</u>, No. CV930135310S, 1995 WL 80103, at *3 (Conn. Super. Ct. 1995). Crediting the facts alleged, CWCAM's conduct as special servicer of the loans at issue involved no such practices.  Thus, this claim is properly dismissed.

    2.  <u>Claims Related to the Phoenix Property</u>

    As mentioned above, the complaints allege that CWCAM interfered with RCM's sale of the Phoenix property to prevent the deal from closing in order to deprive Mr. Belfonti of cash flow needed to meet obligations, including the Riverview and Groton loans.  Specifically, plaintiffs allege CWCAM declined to allow the proposed buyer of the Phoenix property to assume the loan unless three unlawful conditions were satisfied.  Plaintiffs allege that if the sale had gone through, the proceeds would have been used to enable the plaintiffs to continue to service the loans at issue here.  These allegations fail to state a plausible claim for the reasons stated below.

    a.  <u>Tortious Interference</u>

A claim for tortious interference with business relations under Connecticut law requires that the defendant was aware of the existence of a beneficial relationship between the plaintiff and a third party at the time of the allegedly wrongful conduct. <u>See</u> <u>Solomon</u>, 196 Conn. at 383.  The conditions on the sale of the Phoenix property were imposed on March 9, 2009.  The loans at issue here were not transferred to CWCAM as special servicer until several months later, and the complaints do not allege that CWCAM knew about these loans before they were transferred.  Given these facts, it is implausible that CWCAM imposed the conditions intending to cause the plaintiffs to default on these loans.

    b.  <u>Good Faith and Fair Dealing</u>

As mentioned above, the implied covenant of good faith and fair dealing seeks to give effect to the parties' contractual intent.  The plaintiffs had no contractual relationship with CWCAM relating to the Phoenix property.  Accordingly, insofar as the plaintiffs are attempting to state a claim against CWCAM for breach of the implied covenant regarding the Phoenix property, the complaints fail to state a claim on which relief can be granted.

    c.  <u>CUTPA</u>

A claim under CUTPA requires that the defendant's conduct be the proximate cause of harm to the plaintiff.  <u>Artie's Auto Body,</u>

20

Inc. v. Hartford Fire Ins. Co., 287 Conn. 208, 218 (2008).  The
complaints allege that the conditions imposed on the sale of the
Phoenix Property caused the plaintiffs to default on their loans
because it prevented Mr. Belfonti from accessing cash he would
have used to service the loans.  Connecticut law indicates that
indirectly injured CUTPA plaintiffs should not be allowed to
proceed when a directly injured party is better positioned to
sue.  See Town of West Hartford v. Martha Cullina, LLP, 85 Conn.
App. 15, 21-22 (2004).  Here, the party directly injured by the
allegedly unlawful conditions imposed on the proposed sale of the
Phoenix property is RCM.  Plaintiffs have not shown that they
are better positioned than RCM to sue for harm caused by the
allegedly unlawful conditions.

Moreover, the complaints fail to allege the content of the
conditions CWCAM imposed on the sale.  The complaints assert that
the conditions were "onerous, extraneous and inequitable,"
"unreasonable and bad faith," and "imposed in direct
contravention to the operative transaction documents."  These are
not allegations of fact but conclusory statements, which will not
save a complaint from dismissal.  See Iqbal, 129 S. Ct. at 1949.
In the absence of factual allegations showing that the conditions
were illegal, the complaints fail to adequately plead a claim on
which relief can be granted.

3.  Claims for Civil Conspiracy

21

A claim for civil conspiracy under Connecticut law requires an underlying tort. <u>Chapman Lumber, Inc. v. Tager</u>, 288 Conn. 69, 100-01 & n.34 (2008).  Because no tort is sufficiently pleaded, any conspiracy claim also necessarily fails.

III.  <u>Conclusion</u>

For the foregoing reasons, the motions to dismiss are hereby granted.

So ordered this 9th day of January 2012.

_____/s/ RNC_____
Robert N. Chatigny
United States District Judge
